James R. MABRY, David M. Sneary, et al., Plaintiffs,

v.

Charles G. DAVIS, Assessor-Collector of Taxes, Bexar County, Texas, Waggoner Carr, Attorney General of Texas, and Calvin Galm and Mrs. Eugene Irvin, Election Judges for Precincts 86 and 135, respectively, Bexar County, Texas, for the 1964 General Election, Defendants.

Civ. A. No. 3395.

United States District Court
W. D. Texas,
San Antonio Division.

Aug. 26, 1964.

Maverick, Tynan & Gochman, Arthur M. Gochman, San Antonio, Tex., for plaintiffs.

James E. Barlow, Criminal Dist. Atty. of Bexar County, Tex., Preston H. Dial, Asst. Criminal Dist. Atty., San Antonio, Tex., for defendants Charles G. Davis, Calvin Galm and Mrs. Eugene Irvin.

Waggoner Carr, Atty. Gen. of Texas, Mary K. Wall, Asst. Atty. Gen., Austin, Tex., for defendant Waggoner Carr.

Before BROWN, Circuit Judge, SPEARS, Chief Judge, and THORNBERRY, District Judge.

SPEARS, Chief Judge.

The question in this case is whether or not Article 6, Section 2, of the Constitution of Texas, Vernon's Ann. St., and Article 5.02, Vernon's Annotated Texas Statutes Election Code, insofar as they wholly deny the right to vote in Texas to members of the armed forces residing in this state who enter military service from other states, violate the equal protection clause of the Fourteenth Amendment to the Constitution of the United States. We hold that they do.

This suit is brought as a class action in behalf of plaintiffs and others in the State of Texas "who are similarly situated because of their being members of the armed forces of the United States or component branches thereof, or in the military service of the United States".

In general, the plaintiffs claim that they, as individuals, and the class they represent, are deprived of their right to vote in Texas solely because they are members of the armed forces; that they are otherwise fully qualified to vote in every way; and that the Constitution and statute of Texas which prevent them from voting are in derogation of Article 1, Sections 2 and 4 of the Federal Constitution, as well as Sections 1 and 2 of the Fourteenth Amendment to that Constitution. They ask for judgment declaring the Texas laws unconstitutional, and for injunctive relief against the defendants, in consequence of which this three-judge Court was designated pursuant to Title 28 U.S.C. § 2281.

Defendants contend that the Court does not have jurisdiction of this controversy, but that, in any event, the Constitution and laws of Texas relating to the classification of electors do not violate any provision of the United States Constitution.

The facts are undisputed.

Plaintiff, James R. Mabry, a 27 year old Staff Sergeant in the United States Air Force, resides at 910 Mount Kisco, in Precinct 135, San Antonio, Bexar County, Texas. He came to San Antonio in May, 1959. On September 16, 1963, he was discharged from the Air Force in that city, and he was there when he reenlisted in the Air Force on the following day.

In August, 1960, Sergeant Mabry and his wife moved into a home at 415 Merry Ann, San Antonio, which they then owned. They remained in it as their homestead, paid taxes thereon, slept and had all their belongings there until May, 1963, when they moved into their present home, which they own as their homestead, pay taxes on, and in which they sleep at night and keep all their belongings. At no time since May, 1959, has Sergeant Mabry maintained a residence other than in San Antonio, Bexar County, Texas.

Although Sergeant Mabry entered the armed forces from the State of Wisconsin, he has never voted nor made any attempt to vote in that state. He is not a resident of Wisconsin and has no intention of declaring it as his residence. On the contrary, he has been stationed in San Antonio by his preference, and intends to permanently reside there.

In view of Sergeant Mabry's training in research work he has been frozen at his present station, but stated that: "If the freeze is lifted and I am transferred someplace else, I would probably not take

steps to resign from the service but would obey the orders given me. I would travel alone. My family would still stay at my present address and I would return to Texas either when I got out of the service (or) when I returned. I would make every effort to come back to the job I now hold, and since I am familiar with it, I know from (the) experience of other individuals that this is very possible. In fact, it is almost assured that I could come back to the same job because they do need trained research workers".

Plaintiff, David M. Sneary, a 26 year old First Lieutenant in the United States Air Force, resides at 2222 Rawhide, in Precinct 86, San Antonio, Bexar County, Texas. He came to San Antonio in May, 1962, at which time he was, and still is, a member of the armed forces.

Upon his arrival in San Antonio, Lieutenant Sneary moved into a house with his wife at 5518 Plumtree, where they remained until June, 1963, when they moved into their present address, which they own as their homestead, pay taxes on, and where they sleep at night and keep all their belongings. At no time since May, 1962, has Lieutenant Sneary maintained a residence other than in San Antonio, Bexar County, Texas.

Lieutenant Sneary entered the armed forces from the State of Oklahoma, but is not a resident of that state and has no intention of declaring it as his residence. He is in San Antonio at his own request, and intends to permanently reside there. He does say, however, that: "If I received orders transferring me to another state I would obey the orders and not make an effort to get out of the service. If the orders are of a nature to remain here or go overseas, I would more than likely remain here, but if I am flatly ordered to an overseas base, I would leave my family here and go alone and then return after the assignment".

Defendant, Charles G. Davis, is the Assessor-Collector of taxes of Bexar County, Texas, and is charged with the duty of collecting poll taxes and issuing receipts therefor; defendant, Waggoner Carr, is Attorney General of the State of Texas, in which capacity he has sought to uphold the provisions of Article 6, Section 2 of the Texas Constitution, and the Election Code of the State of Texas; and defendants, Calvin Galm and Mrs. Eugene Irvin, are the Election Judges for Precincts 86 and 135, respectively, Bexar County, Texas, for the 1964 General Election.

Plaintiffs fulfill all the qualifications of persons required to pay a poll tax and entitled thereto.[1] They are native-born citizens of the United States, have established their residences in the State of Texas, and their occupation is that of members of the armed forces. Payment of a poll tax is a qualification for voting under the laws of the State of Texas.[2]

In the year 1964, the defendant Assessor-Collector issued poll tax receipts to Dorothy Mabry, wife of James R. Mabry, and to Clara L. Sneary, wife of David M. Sneary. On January 23, 1964, he issued to James R. Mabry 1964 Poll Tax Receipt No. 140401, upon payment by him of a poll tax for 1963, but wrote thereon, "Not Eligible To Vote". On January 24, 1964, he issued to David M. Sneary 1964 Poll Tax Receipt No. 140402, upon payment by him of a poll tax for 1963, but wrote thereon, "Not Entitled To Vote". He refused to place plaintiffs, or any person of the class they represent, on the list of persons entitled to vote, which list he is required to make under the laws of the State of Texas[3], and instructed his employees that unless persons in the military service can state they entered the service from Bexar County, they were not to collect or accept pay-

1. Vernon's Ann.Tex.St. Election Code, art. 5.09; Vernon's Ann.Tex.St. Tax—Gen., art. 2.01.

2. Vernon's' Ann.Tex.Const. art. 6, § 2; Vernon's' Ann.Tex.St. Election Code, art. 5.02.

3. Vernon's Ann.Tex.St. Election Code, art. 5.22.

ment for a poll tax from them. The poll tax payments made by the named plaintiffs, and the poll tax receipts they received in payment of the 1963 tax, were executed by agreement of the parties.

It is agreed that both plaintiffs are residents of San Antonio, Bexar County, Texas, under the provisions of the Texas Election Code [4], and that it is solely by virtue of the operation of the Constitutional provision and the implementing Statute [5] that they are unable to vote in Texas.

■ This Court has jurisdiction of this controversy, because the complaint herein plainly sets forth a case arising under Section 1 of the Fourteenth Amendment to the Constitution of the United States.[6] Since we are convinced that the provisions of the Texas Constitution and the implementing statute involved, insofar as they totally deny the right to vote in Texas to plaintiffs and those similarly situated, violate the equal protection clause of the Fourteenth Amendment, our discussion will be limited to a consideration of them in the light of that Amendment to the Federal Constitution.

Section 1 of the Fourteenth Amendment provides:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any citizen of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws". U.S.C.A.Const. Amend. 14, § 1.

Article 6, Section 2, of the Constitution of Texas, as amended in 1954, reads as follows:

"Any member of the Armed Forces of the United States or component branches thereof, or in the military service of the United States, may vote only in the county in which he or she resided at the time of entering such service so long as he or she is a member of the Armed Forces". Vernon's Ann.Tex.Const. art 6, § 2.

It is interesting to note that the amendment to the Texas Constitution makes no mention of the serviceman's wife, so her right to vote is not affected thereby, one way or the other.

■ In the very similar case of Carrington v. Rash, 378 S.W.2d 304 (April 29, 1964), the Supreme Court of Texas recently held that the purpose of the amendment was "to prevent a person entering military service as a resident citizen of a county in Texas from acquiring a different voting residence in Texas during the period of his military service, and to prevent a person entering military service as a resident citizen of another state from acquiring a voting residence in Texas during the period of military service." 378 S.W.2d, at 305. We, of course, accept this construction of the amendment by the highest Court of the state. That very able Court, however, by a majority of seven to two was also of the opinion that denying to military personnel "the right of suffrage in the place where they may be stationed—while in no sense denying the exercise of such right in their place of original residence —is not unreasonable and the classification established is nondiscriminatory", 378 S.W.2d at 306, and then concluded

---

4. "The 'residence' of a single man is where he usually sleeps at night; that of a married man is where his wife resides, or if he be permanently separated from his wife, his residence is where he usually sleeps at night; * * *." Vernon's Ann.Tex.St. Election Code, art. 5.08.

5. Vernon's Ann.Tex.Const. art. 6, § 2; Vernon's Ann.Tex.St. Election Code, art. 5.02.

6. 28 U.S.C.A. §§ 1343 and 1357; Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962); U.S.C.A.Const. Amend. 14, § 1.

that a resident of another state upon entering the military service does not possess "a 'federally protected right' to vote in Texas elections while in the military service in whatever county or district in Texas to which he may elect to change his voting residence". 378 S.W.2d, at 307.

We disagree with the holding of the majority of the Court, and agree with the minority that the attempt of the state to segregate *all* persons in military service as a class to be treated differently from other persons in regard to the right to vote, "is arbitrary and unreasonable, thereby violating the equal protection clause of the Fourteenth Amendment of the Constitution of the United States". 378 S.W.2d, at 309. After recognizing that "the Federal Constitution, or any of its amendments, does not give to a person the privilege to vote in any state", citing Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627, Associate Justice Clyde E. Smith, in his dissenting opinion, concurred in by Chief Justice Robert W. Calvert, and using language which we approve and adopt, said:

"* * * It is clear that the privilege to vote in a state is within the jurisdiction of the state itself, 'to be exercised as the state may direct * * *'. Pope v. Williams, 193 U.S. 621, 24 S.Ct. 573, 48 L.Ed. 817 (1904). In fact, the Federal Constitution makes voters' qualifications rest on state law even in federal elections. Art. 1, § 2. However, in exercising its broad powers to determine the conditions under which the right of suffrage may be exercised, the state cannot impose standards which the United States Constitution condemns as discriminatory. See Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed.2d 1072.

"It is elementary that 'class legislation' is invalid where the classification is arbitrary and unreasonable. The classification must rest on real and substantial differences and must reasonably promote some proper object of public welfare or interest. Thus, without contravening any restriction that Congress has imposed, a state can determine that only those persons who are literate should vote since '(t)he ability to read and write * * * has *some relation* to standards designed to promote intelligent use of the ballot.' Lassiter v. Northampton County Bd. of Elections, supra.

"In the present case Respondents contend that the purpose of the Constitutional amendment in question is to prevent a concentration of military voting strength in areas where military bases are located because such concentration might lead to complete domination and control of local politics by military men to the prejudice of the civilian citizens of the community. In my opinion this is not a reasonable ground upon which the State can say that there exists a real and substantial difference between servicemen and other citizens, and thereby confer different voting rights on these classes.

"With present day mobility and industrialization, large groups, *other than servicemen,* move into the various communities of this state for limited stays, and establish voting residence. One need only look to the large shifts of civilian population to major construction areas as an illustration of this fact.

"Wherein lies the reasonable basis for distinguishing between these groups?

"In the recent case of Gray v. Sanders, 372 U.S. 368, 83 S.Ct. 801, 9 L.Ed.2d 821 (1963), our Supreme Court has said:

"' * * * there is no indication in the Constitution that homesite or *occupation* affords a permissible basis for distinguishing between qualified voters within a State. * * *' (Emphasis added.)

"' * * * Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote—whatever their race, whatever their sex, *whatever their occupation*, whatever their income, and wherever their home may be in that geographical unit. This is required by the Equal Protection Clause of the Fourteenth Amendment. The concept of "we the people" un- der the Constitution visualizes no preferred class of voters but equality among those *who meet the basic qualifications.* * * * ' (Emphasis added.)"

█ The apportionment cases recently decided by the Supreme Court of the United States emphasize the paramount importance of the citizen's right to vote [7], and that court has made it abundantly clear that there may be no discrimination made between individuals.[8]

7. In Davis v. Mann, 377 U.S. 678, 84 S. Ct. 1441 at p. 1448, 12 L.Ed. 609 at pp. 617, 618 (1964) concerning areas in the State of Virginia containing "large numbers of military and military-related personnel", the Court said: "Discrimination against a class of individuals, merely because of the nature of their employment, without more being shown, is constitutionally impermissible. And, state policy, as evidenced by Virginia's election laws, actually favors and fosters voting by military and military-related personnel". Footnote 11, 84 S.Ct. p. 1448, 12 L.Ed.2d p. 618: "Virginia's election laws enable persons in the armed forces to vote without registration or payment of poll tax. * * * Although the mere stationing of military personnel in the State does not give them residence, Virginia election officials interpret the applicable statutory provisions to mean that residence for military personnel is determined in the same manner as for all other citizens. * * * "
Gray v. Sanders, 372 U.S. 368 at pp. 379, 380, 83 S.Ct. 801 at p. 808, 9 L. Ed.2d 821 (1963): "The concept of 'we the people' under the Constitution visualizes no preferred class of voters but equality among those who meet the basic qualifications." Quoting Lassiter v. Northampton County Election Board at p. 379, of 372 U.S., at p. 808 of 83 S.Ct., 360 U.S. 45, 79 S.Ct. 985, 3 L.Ed. 2d 1072: "[A] State may if it chooses require voters to pass literacy tests, provided of course that literacy is not used as a cloak to discriminate against one class or group."
Wesberry v. Sanders, 376 U.S. 1 at p. 17, 84 S.Ct. 526 at p. 535, 11 L.Ed. 2d 481 (1964): "Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right". Concurring opinion:

"[T]he equal protection clause of the Fourteenth Amendment forbids * * * discrimination. It does not permit the states to pick out certain qualified citizens or groups of citizens and deny them the right to vote at all."
Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362 at p. 1378, 12 L.Ed.2d 506 at p. 523 (1964): "[H]istory has seen a continuing expansion of the scope of the right of suffrage in this country. The right to vote freely * * * is of the essence of a democratic society and any restrictions on that right strike at the heart of representative government." At page 1379 of 84 S.Ct., at page 524 of 12 L.Ed.2d: "* * * it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action".
Baker v. Carr, 369 U.S. 186 at p. 244, 82 S.Ct. 691 at p. 724, 7 L.Ed.2d 663 (1962). Justice Douglas in his concurring opinion said: "Within limits (voting) qualifications may be fixed by state law. * * * It is * * * clear that by reason of the commands of the Constitution there are several qualifications that a State may not require. * * * * * * a third barrier to a State's freedom in prescribing qualifications of voters * * * is the equal Protection Clause of the Fourteenth Amendment * * *. The traditional test under the Equal Protection Clause has been whether a State has made 'an invidious discrimination,' as it does when it selects 'a particular race or nationality for oppressive treatment.'"
See also: Lucas v. Forty-Fourth General Assembly of the State of Colorado, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964).

8. Lassiter v. Northampton County Board of Elections, 360 U.S. 45, 51, 79 S.Ct.

Defendants insist that the Constitutional Amendment and the statute involved are in accord with the basic philosophy of this country which subordinates the military to the civilian; that the thinking of military personnel who compose more of a "floating population", would probably differ from that of the civilians in the community; that in some communities in Texas there could be an overwhelming number of military votes compared with the civilian votes if a strong-willed military commander, who was having trouble with local officials, was tempted "to find the means of persuading or inducing many of the men under his control to go along with a particular idea"; and that the fear of a military take-over, together with the right of government to protect itself against that hazard are sufficient to justify as reasonable the imposition of the total restraint in order to make that impossible.

985, 3 L.Ed.2d 1072 (1959); Pope v. Williams, 193 U.S. 621, 632, 24 S.Ct. 573, 48 L.Ed. 817 (1904).
See also: United States v. Louisiana, 225 F.Supp. 353, 358 (3-Judge E.D.La. 1963), where Circuit Judge Wisdom commented: "There is no license for the loose statement that in our constitutional system the qualification of voters is 'exclusively' committed to the States. * * * More accurately, the States, under Article 1, Section 2 of the Constitution and the Seventeenth Amendment, are free to establish voting qualifications—only if the qualifications do not transgress the United States Constitution. * * * The books are filled with examples of state election laws and practices found to transgress constitutional guaranties. * * *"

9. Vernon's Ann.Tex.St. Election Code, Article 5.02.

10. Vernon's Ann.Tex.St. Election Code, Article 5.08; Mills v. Bartlett, 375 S.W. 2d 940, 943 (Tex.Civ.App.1964); Farrell v. Jordan, 338 S.W.2d 269, 274 (Tex. Civ.App.1960).

11. "If the county collector has reason to believe that one who applies to pay his poll tax or secure his certificate of exemption from its payment, has falsely stated his age, occupation, precinct of his residence, or length of his residence in

We believe, however, that present election laws in Texas, separate and apart from those under attack, provide sufficient safeguards to make it highly unlikely that the balance of voting power between the military and civilian in this state will be substantially altered by a removal of the ban against those who enter military service from another state. A qualified elector in Texas must be a resident of the state for one year and of the county for six months.[9] More is required of him than mere bodily presence in the state and in the county for the prescribed time. His intention, not necessarily controlled by his subjective statement, but ascertained in the light of all the surrounding circumstances, is also a proper subject for inquiry in determining his residence for voting purposes.[10] In addition, he may be challenged when he purchases his poll tax,[11] and when he presents himself to the election judge to vote.[12] Therefore, it does not follow that

the State, county and city, or any other matter touching his qualifications to vote, he shall require proof of such statement; and, if on inquiry, he is satisfied that said person has sworn falsely, he shall make a memorandum of the words used in such statement, and present the same to the foreman of the next grand jury or if the County Collector does not personally know one who applies to pay his poll tax or secure his certificate of exemption from its payment as being a resident in the precinct which such person claims as that of his residence, it shall be the duty of such collector to require proof of such residence or of such other facts as may be necessary." Vernon's Ann.Tex.St. Election Code, Article 5.21.

12. "When a person offering to vote at any general, special, or primary election shall be objected to by an election judge or clerk, a poll watcher, or any other person, the presiding judge shall examine him upon oath touching the points of such objection, and if such person establishes his right to vote to the satisfaction of the presiding judge, he shall be permitted to vote, and the word 'sworn' shall be written upon the poll list opposite the name of the voter. If upon his own oath the person fails to establish his right to vote to the satisfaction of the presiding judge, his vote shall

everyone within the military classification involved will automatically be entitled to vote in Texas. Nor can it be assumed that those who do not want to qualify to vote here would remain silent if an attempt was made to compel them to forfeit the right to vote somewhere else in order to satisfy the whim and caprice of a base commander in Texas who might, contrary to law and military regulations,[13] develop delusions of grandeur. It should also be remembered that each military commander in the field has officers with superior rank over him, all of whom must answer to the President, as Commander-in-Chief, who is a civilian. And he must answer to the Congress and to the people.

But even if the present laws are not adequate to protect against the hazard of a military take-over at the polls, there is nothing to prevent the state from setting up more stringent conditions under which the right of suffrage may be exercised, so long as they are reasonable and do not discriminate between individuals.[14] The vice in the state amendment is that it constitutes a *complete* abrogation of the right of plaintiffs to vote in Texas under *any* circumstances while they are in the military service.

As a practical matter, a great portion of our military personnel are civilians who are serving a period of enlistment before becoming civilians again. Even though they are subject to the orders of their superiors with respect to the installations at which they are stationed, this does not mean that they are under any disability to form an intent to change their legal residence from one place to another. By the same token, they do not have to change that residence unless they want to.

The fact that almost every other state permits qualified military personnel to vote [15] indicates that, in those states at

---

not be accepted unless in addition to his own oath he submits proof by the oath of one well-known resident of the precinct that he is a qualified voter at such election and in such precinct. When such proof is submitted, his vote shall be accepted, and the word 'challenged' and the name and address of the person testifying under oath as to the voter's qualifications shall be written on the poll list opposite the name of the voter." Vernon's Ann.Tex.St. Election Code, Article 8.09.

13. " * * *, in accordance with Federal law and Armed Forces regulations, no commissioned, warrant, petty, or non-commissioned officer will attempt to influence any person as to his choice of candidate * * *." Voting Information, 1964, Armed Forces Information and Education, Department of Defense, page ix. (Defendant's Exhibit E.)

14. See: Footnote 8, supra.
Texas permits a person serving in the military branch of the United States who was not previously a citizen of the state, and who at the time of filing a petition for divorce has been stationed in a military installation in the state for a continuous period of twelve (12) months next, and in the county where the suit is filed for a continuous period of six (6) months next preceding the filing of same, to be deemed an actual bona fide

inhabitant and resident respectively of the state and of the county where such military installation is located, for the purpose of maintaining the suit for divorce. Vernon's Ann.Civ.St. art. 4631.

15. "For voting purposes the legal residence of members of the Armed Forces is generally the state from which they entered military service. This home state remains as the only state in which a person in the Armed Forces has the legal right to vote unless certain conditions are met. Almost all states except Texas will permit persons in the Armed Forces to acquire a new voting residence within their jurisdiction. When this is accomplished, voting rights in the old state of residence are lost." Voting Information, 1964, Armed Forces Information and Education, Department of Defense, page x. (Defendants' Exhibit E.)
It was stipulated that if called as a witness the Voting Officer of the Department of the Air Force would testify: "The State of Texas is the only state in the union which will not permit an otherwise eligible member of the Armed Forces of the United States to acquire legal domicile, for the purpose of voting, upon demonstration of intent to do so, and upon fulfillment of state requirements of residence * * *. Most states will permit a person in the military to

least, the danger of the military overwhelming the civilians at the ballot box is not considered too great. We know of no community which has requested that its military base be closed, nor have we been advised of anything having taken place in any other state to justify a reasonable fear of military domination in any part of Texas.

Plaintiffs have a genuine bona fide desire to live and rear their families in this state. They, and others like them, should be encouraged to purchase their homes, participate in community affairs, and remain in Texas when their military service is completed. But this cannot be done effectively if they are denied the fundamental right to cast their votes in this state.

The fact that servicemen may think differently from others in the community constitutes no reason to discriminate against them. Implicit in the concept of full citizenship under the Constitution in our free society is the right to think as one pleases, and then, if he is a qualified elector under reasonable standards imposed by the state, to vote as his conscience dictates. In this connection, it is difficult to reconcile permitting the wife of a serviceman with whom he is living to vote, and at the same time denying that right to him simply because he wears a military uniform. Certainly, neither the degree of her interest in the community, nor her good faith intention to reside their permanently, would ordinarily be any greater than his.

Defendants say that plaintiffs are not typical of persons in the military service. However, plaintiffs and those others who otherwise meet all of the requirements of qualified electors in this state, are the only ones with whom we are dealing. On the other hand, the enlisted man in the barracks, for example, who has done

nothing overtly to establish a residence in the community, would, we think, if challenged, be hard put to prove his qualifications to vote, irrespective of whether or not he was acting under orders of his commanding officer.

■ It is further contended by defendants that when Texas was readmitted to the Union, Congress, by Act approved March 30, 1870 (16 Stat. 80), interpreted the then existing Constitution of Texas, which completely disfranchised residents who were in the military service, as not violating the Fourteenth Amendment. They say that this has great weight and gives rise to the presumption that the interpretation is correct. The same argument, offered in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), was answered by Chief Justice Warren when he said, in part: "Congress simply lacks the constitutional power to insulate States from attack with respect to alleged deprivations of individual constitutional rights." 84 S.Ct., at 1392, 12 L.Ed.2d, at 539.

Since we have concluded that Article 6, Section 2 of the Texas Constitution, and Article 5.02, Vernon's Annotated Texas Statutes Election Code, insofar as they wholly deny the right to vote in Texas to plaintiffs and those similarly situated, violate the equal protection clause of the Fourteenth Amendment to the United States Constitution, plaintiffs' petition for injunctive relief restraining and enjoining the defendants from depriving them and anyone else entering military service as a resident citizen of another state who otherwise in good faith meets all of the requirements of a qualified elector in this state, of their right to vote in Texas, is granted.

BROWN, Circuit Judge, and THORNBERRY, District Judge, concur.

acquire a new domicile while in active service. This is accomplished by the military member showing through external evidence that he intends to reside on a permanent basis in the new state. For instance, if a person in the military purchases a home, lives off the military reservation and participates in the civilian activities of the community, most states will permit him to acquire domicile, after he has resided in the new state for the length of time required by law. This time varies from six months to two years. The most common length of time is a one year period."