# LASSITER *v.* NORTHAMPTON COUNTY BOARD OF ELECTIONS.

No. 584.   Argued May 18–19, 1959.—Decided June 8, 1959.

*Samuel S. Mitchell* argued the cause for appellant. With him on the brief were *Herman L. Taylor* and *James R. Walker, Jr.*

*I. Beverly Lake* argued the cause and filed a brief for appellee.

*Malcolm B. Seawell,* Attorney General of North Carolina, and *Ralph Moody,* Assistant Attorney General, filed a brief for the State of North Carolina, as *amicus curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This controversy started in a Federal District Court. Appellant, a Negro citizen of North Carolina, sued to have the literacy test for voters prescribed by that State declared unconstitutional and void. A three-judge court was convened. That court noted that the literacy test was part of a provision of the North Carolina Constitution that also included a grandfather clause. It said that

the grandfather clause plainly would be unconstitutional under *Guinn* v. *United States,* 238 U. S. 347. It noted, however, that the North Carolina *statute* which enforced the registration requirements contained in the State Constitution had been superseded by a 1957 Act and that the 1957 Act does not contain the grandfather clause or any reference to it. But being uncertain as to the significance of the 1957 Act and deeming it wise to have all administrative remedies under that Act exhausted before the federal court acted, it stayed its action, retaining jurisdiction for a reasonable time to enable appellant to exhaust her administrative remedies and obtain from the state courts an interpretation of the statute in light of the State Constitution. 152 F. Supp. 295.

Thereupon the instant case was commenced. It started as an administrative proceeding. Appellant applied for registration as a voter. Her registration was denied by the registrar because she refused to submit to a literacy test as required by the North Carolina statute.[1] She appealed to the County Board of Elections. On the *de novo* hearing before that Board appellant again refused to take the literacy test and she was again denied registration for that reason. She appealed to the Superior Court which sustained the Board against the claim that the requirement of the literacy test violated the Fourteenth, Fifteenth, and Seventeenth Amendments of the Federal Constitution. Preserving her federal question, she appealed to the North Carolina Supreme Court which affirmed the lower court. 248 N. C. 102, 102 S. E. 2d 853.

---

[1] This Act, passed in 1957, provides in § 163–28 as follows:

"Every person presenting himself for registration shall be able to read and write any section of the Constitution of North Carolina in the English language. It shall be the duty of each registrar to administer the provisions of this section."

Sections 163–28.1, 163–28.2, and 163–28.3 provide the administrative remedies pursued in this case.

The case came here by appeal, 28 U. S. C. § 1257 (2), and we noted probable jurisdiction.   358 U. S. 916.

The literacy test is a part of § 4 of Art. VI of the North Carolina Constitution.   That test is contained in the first sentence of § 4.   The second sentence contains a so-called grandfather clause.   The entire § 4 reads as follows:

> "Every person presenting himself for registration shall be able to read and write any section of the Constitution in the English language.   But no male person who was, on January 1, 1867, or at any time prior thereto, entitled to vote under the laws of any state in the United States wherein he then resided, and no lineal descendant of any such person, shall be denied the right to register and vote at any election in this State by reason of his failure to possess the educational qualifications herein prescribed: Provided, he shall have registered in accordance with the terms of this section prior to December 1, 1908.   The General Assembly shall provide for the registration of all persons entitled to vote without the educational qualifications herein prescribed, and shall, on or before November 1, 1908, provide for the making of a permanent record of such registration, and all persons so registered shall forever thereafter have the right to vote in all elections by the people in this State, unless disqualified under section 2 of this article."

Originally Art. VI contained in § 5 the following provision:

> "That this amendment to the Constitution is presented and adopted as one indivisible plan for the regulation of the suffrage, with the intent and purpose to so connect the different parts, and to make them so dependent upon each other, that the whole shall stand or fall together."

But the North Carolina Supreme Court in the instant case held that a 1945 amendment to Article VI freed it of the indivisibility clause. That amendment rephrased § 1 of Art. VI to read as follows:

"Every person born in the United States, and every person who has been naturalized, twenty-one years of age, and possessing the qualifications set out in this article, shall be entitled to vote . . . ."

That court said that "one of those qualifications" was the literacy test contained in § 4 of Art..VI; and that the 1945 amendment "had the effect of incorporating and adopting anew the provisions as to the qualifications required of a voter as set out in Article VI, freed of the indivisibility clause of the 1902 amendment. And the way was made clear for the General Assembly to act." 248 N. C., at 112, 102 S. E. 2d 860, 861.

In 1957 the Legislature rewrote General Statutes §163–28 as we have noted.[2] Prior to that 1957 amendment § 163–28 perpetuated the grandfather clause contained in § 4 of Art. VI of the Constitution and § 163–32 established a procedure for registration to effectuate it.[3] But

---

[2] Note 1, *supra*.

[3] Section 163–32 provided:

"Every person claiming the benefit of section four of article six of the Constitution of North Carolina, as ratified at the general election on the second day of August, one thousand nine hundred, and who shall be entitled to register upon the permanent record for registration provided for under said section four, shall prior to December first, one thousand nine hundred and eight, apply for registration to the officer charged with the registration of voters as prescribed by law in each regular election to be held in the State for members of the General Assembly, and such persons shall take and subscribe before such officer an oath in the following form, viz.:

"I am a citizen of the United States and of the State of North Carolina; I am — years of age. I was, on the first day of January, A. D. one thousand eight hundred and sixty-seven, or prior to said date, entitled to vote under the constitution and laws of the state

the 1957 amendment contained a provision that "All laws and clauses of laws in conflict with this Act are hereby repealed.".[4]   The federal three-judge court ruled that this 1957 amendment eliminated the grandfather clause from the statute. 152 F. Supp., at 296.

The Attorney General of North Carolina, in an *amicus* brief, agrees that the grandfather clause contained in Art. VI is in conflict with the Fifteenth Amendment. Appellee maintains that the North Carolina Supreme Court ruled that the invalidity of that part of Art. VI does not impair the remainder of Art. VI since the 1945 amendment to Art. VI freed it of its indivisibility clause. Under that view Art. VI would impose the same literacy test as that imposed by the 1957 statute and neither would be linked with the grandfather clause which, though present in print, is separable from the rest and void.   We so read the opinion of the North Carolina Supreme Court.

Appellant argues that that is not the end of the problem presented by the grandfather clause.   There is a provision in the General Statutes for permanent registration in some counties.[5]   Appellant points out that

---

of ———, in which I then resided (or, I am a lineal descendant of ———, who was, on January one, one thousand eight hundred and sixty-seven, or prior to that date, entitled to vote under the constitution and laws of the state of ———, wherein he then resided."

[4] N. C. Laws 1957, c. 287, pp. 277, 278.

[5] Section 163–31.2 provides:
"In counties having one or more municipalities with a population in excess of 10,000 and in which a modern loose-leaf and visible registration system has been established as permitted by G. S. 163–43, with a full time registration as authorized by G. S. 163–31, such registration shall be a permanent public record of registration and qualification to vote, and the same shall not thereafter be cancelled and a new registration ordered, either by precinct or countywide, unless such registration has been lost or destroyed by theft, fire or other hazard."

although the cut-off date in the grandfather clause was December 1, 1908, those who registered before then might still be voting. If they were allowed to vote without taking a literacy test and if appellant were denied the right to vote unless she passed it, members of the white race would receive preferential privileges of the ballot contrary to the command of the Fifteenth Amendment. That would be analogous to the problem posed in the classic case of *Yick Wo* v. *Hopkins,* 118 U. S. 356, where an ordinance unimpeachable on its face was applied in such a way as to violate the guarantee of equal protection contained in the Fourteenth Amendment. But this issue of discrimination in the actual operation of the ballot laws of North Carolina has not been framed in the issues presented for the state court litigation. Cf. *Williams* v. *Mississippi,* 170 U. S. 213, 225. So we do not reach it. But we mention it in passing so that it may be clear that nothing we say or do here will prejudice appellant in tendering that issue in the federal proceedings which await the termination of this state court litigation.

We come then to the question whether a State may consistently with the Fourteenth and Seventeenth Amendments apply a literacy test to all voters irrespective of race or color. The Court in *Guinn* v. *United States, supra,* at 366, disposed of the question in a few words, "No time need be spent on the question of the validity of the literacy test considered alone since as we have seen its establishment was but the exercise by the State of a lawful power vested in it not subject to our supervision, and indeed, its validity is admitted."

The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, *Pope* v. *Williams,* 193 U. S. 621, 633; *Mason* v. *Missouri,* 179 U. S. 328, 335, absent of course the discrimination which the Constitution con-

demns. Article I, § 2 of the Constitution in its provision for the election of members of the House of Representatives and the Seventeenth Amendment in its provision for the election of Senators provide that officials will be chosen "by the People." Each provision goes on to state that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." So while the right of suffrage is established and guaranteed by the Constitution (*Ex parte Yarbrough,* 110 U. S. 651, 663–665; *Smith* v. *Allwright,* 321 U. S. 649, 661–662) it is subject to the imposition of state standards which are not discriminatory and which do not contravene any restriction that Congress, acting pursuant to its constitutional powers, has imposed. See *United States* v. *Classic,* 313 U. S. 299, 315. While § 2 of the Fourteenth Amendment, which provides for apportionment of Representatives among the States according to their respective numbers counting the whole number of persons in each State (except Indians not taxed), speaks of "the right to vote," the right protected "refers to the right to vote as established by the laws and constitution of the State." *McPherson* v. *Blacker,* 146 U. S. 1, 39.

We do not suggest that any standards which a State desires to adopt may be required of voters. But there is wide scope for exercise of its jurisdiction. Residence requirements, age, previous criminal record (*Davis* v. *Beason,* 133 U. S. 333, 345–347) are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters. The ability to read and write likewise has some relation to standards designed to promote intelligent use of the ballot. Literacy and illiteracy are neutral on race, creed, color, and sex, as reports around the world show.[6] Lit-

---

[6] World Illiteracy at Mid-Century, Unesco (1957).

eracy and intelligence are obviously not synonymous. Illiterate people may be intelligent voters. Yet in our society where newspapers, periodicals, books, and other printed matter canvass and debate campaign issues, a State might conclude that only those who are literate should exercise the franchise. Cf. *Franklin* v. *Harper,* 205 Ga. 779, 55 S. E. 2d 221, appeal dismissed 339 U. S. 946. It was said last century in Massachusetts that a literacy test was designed to insure an "independent and intelligent" exercise of the right of suffrage.[7]    *Stone* v.

---

[7] Nineteen States, including North Carolina, have some sort of literacy requirement as a prerequisite to eligibility for voting. Five require that the voter be able to read a section of the State or Federal Constitution and write his own name. Arizona Rev. Stat. § 16–101; Cal. Election Code § 220; Del. Code Ann., Tit. 15, § 1701; Me. Rev. Stat., c. 3, § 2; Mass. Gen. L. Ann., c. 51, § 1. Five require that the elector be able to read and write a section of the Federal or State Constitution. Ala. Code, 1940, Tit. 17, § 32; N. H. Rev. Stat. Ann. §§ 55:10–55:12; N. C. Gen. Stat. § 163–28; Okla. Stat. Ann., Tit. 26, § 61; S. C. Code § 23–62. Alabama also requires that the voter be of "good character" and "embrace the duties and obligations of citizenship" under the Federal and State Constitutions. Ala. Code, Tit. 17, § 32 (1955 Supp.).

Two States require that the voter be able to read and write English. N. Y. Election Code § 150; Ore. Rev. Stat. § 247.131. Wyoming (Wyo. Comp. Stat. Ann. § 31–113) and Connecticut (Conn. Gen. Stat. § 9–12) require that the voter read a constitutional provision in English, while Virginia (Va. Code § 24–68) requires that the voting application be written in the applicant's hand before the registrar and without aid, suggestion or memoranda. Washington (Wash. Rev. Code § 29.07.070) has the requirement that the voter be able to read and speak the English language.

Georgia requires that the voter read intelligibly and write legibly a section of the State or Federal Constitution. If he is physically unable to do so, he may qualify if he can give a reasonable interpretation of a section read to him. An alternative means of qualifying is provided: if one has good character and understands the duties and obligations of citizenship under a republican government, and he

*Smith,* 159 Mass. 413–414, 34 N. E. 521. North Carolina agrees. We do not sit in judgment on the wisdom of that policy. We cannot say, however, that it is not an allowable one measured by constitutional standards.

Of course a literacy test, fair on its face, may be employed to perpetuate that discrimination which the Fifteenth Amendment was designed to uproot. No such influence is charged here. On the other hand, a literacy test may be unconstitutional on its face. In *Davis* v. *Schnell,* 81 F. Supp. 872, aff'd 336 U. S. 933, the test was the citizen's ability to "understand and explain" an article of the Federal Constitution. The legislative setting of that provision and the great discretion it vested in the registrar made clear that a literacy requirement was merely a device to make racial discrimination easy. We cannot make the same inference here. The present requirement, applicable to members of all races, is that the prospective voter "be able to read and write any section of the Constitution of North Carolina in the English

---

can answer correctly 20 of 30 questions listed in the statute (*e. g.,* How does the Constitution of Georgia provide that a county site may be changed?, what is treason against the State of Georgia?, who are the solicitor general and the judge of the State Judicial Circuit in which you live?) he is eligible to vote. Geo. Code Ann. §§ 34–117, 34–120.

In Louisiana one qualifies if he can read and write English or his mother tongue, is of good character, and understands the duties and obligations of citizenship under a republican form of government. If he cannot read and write, he can qualify if he can give a reasonable interpretation of a section of the State or Federal Constitution when read to him, and if he is attached to the principles of the Federal and State Constitutions. La. Rev. Stat., Tit. 18, § 31.

In Mississippi the applicant must be able to read and write a section of the State Constitution and give a reasonable interpretation of it. He must also demonstrate to the registrar a reasonable understanding of the duties and obligations of citizenship under a constitutional form of government. Miss. Code Ann. § 3213.

language." That seems to us to be one fair way of determining whether a person is literate, not a calculated scheme to lay springes for the citizen. Certainly we cannot condemn it on its face as a device unrelated to the desire of North Carolina to raise the standards for people of all races who cast the ballot.

*Affirmed.*